The UPJOHN COMPANY, Plaintiff,

v.

David A. KESSLER, M.D., Commissioner of Food and Drugs, Defendant.

No. 4:96–CV–90.

United States District Court,
W.D. Michigan,
Southern Division.

April 30, 1996.

Jon R. Muth, Jon G. March, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, John Vanderstar, Bruce N. Kuhlik, Covington & Burling, Washington, DC, for Upjohn Company.

**440**

Jeffrey D. Smith, Varnum, Riddering, Schmidt & Howlett, Kalamazoo, MI, for Barre–National, Inc.

Gerald C. Kell, U.S. Department of Justice, Office of Consumer Litigation, Washington, DC, for David A. Kessler.

Thomas F. Koernke, Boyden, Waddell, Timmons & Dilley, Grand Rapids, MI, John R. Fleder, Olsson, Frank & Weeda, PC, Washington, DC, for Lemmon Company.

Andrew J. Broder, Vicko, Lane, Payne & Broder, PC, Bingham Farms, MI, Jeffrey Gibbs, Hyman, Phelps & McNamara, Washington, DC, for Bausch & Lomb Pharmaceuticals, Inc.

## *OPINION*

ROBERT HOLMES BELL, District Judge.

Plaintiff The Upjohn Company filed this action for declaratory and injunctive relief to compel the Food and Drug Administration (the "FDA") to grant Plaintiff a three-year period of "market exclusivity" for over-the-counter sales of Rogaine, the company's brand name for minoxidil 2% topical solution.

On April 15, 1996, this Court granted Upjohn's ex parte motion for a temporary restraining order restraining Defendant from approving any Abbreviated New Drug Applications ("ANDA") for OTC topical minoxidil 2% and ordering Defendant to suspend the effective date of any such ANDAs already approved. A hearing on Upjohn's motion for preliminary injunction was scheduled for April 25, 1996. Barre–National, Inc., Lemmon Company, and Bausch & Lomb Pharmaceuticals, Inc. were permitted to intervene in the suit for the limited purpose of asserting the manner in which they would be adversely affected by the entry of a preliminary injunction. Upon consideration of the administrative record, the complaint, the testimony and exhibits, and the memoranda and legal arguments presented, and for the reasons stated below, the Court denies the motion for preliminary injunction.

## I.

Plaintiff, The Upjohn Company ("Upjohn") is a Delaware corporation with its principal place of business in Michigan. Defendant David A. Kessler, M.D., is the Commissioner of Food and Drugs. The Secretary of Health and Human Services has delegated the responsibility for administering the Federal Food, Drug, and Cosmetic Act ("FD & C Act" or "Act") to the FDA through the Commissioner of Food and Drugs. 21 U.S.C. § 393(b)(2).

Upjohn originally developed minoxidil as an antihypertensive agent for the treatment of high blood pressure. When patients using the drug experienced unwanted hair growth, Upjohn began investigations into the use of the drug for treatment of hair loss.

In 1988 the FDA approved Upjohn's new drug application ("NDA") for Rogaine, a 2% minoxidil topical solution for the treatment of certain forms of male hair loss. In 1991 Upjohn received FDA approval for the use of Rogaine in the treatment of female hair loss. The FDA approvals limited Rogaine to sell as a prescription ("Rx") drug.

In September 1991 Upjohn initiated communications with the FDA regarding its desire to have Rogaine approved for over-the-counter ("OTC") sales. Such a switch from Rx to OTC status requires approval of a supplemental NDA by the FDA. Upjohn advised that Rogaine had proven to be a safe treatment and that a sufficiently large body of data had been collected that supported the RX-to-OTC switch.

On April 9, 1992, Upjohn representatives met with FDA representatives to discuss what information the FDA would require in order to evaluate the proposed Rx-to-OTC switch. Among the concerns raised by FDA representatives at this meeting were the low tolerance for any risk of serious adverse effects due to the cosmetic nature of the drug, the need to address cardiovascular risks and the need to address risks associated with gross over use of the product. Upjohn referenced the ongoing IV study in hypertensive patients that it was conducting in connection with its investigation into 5% minoxidil.

On April 29, 1993, Upjohn submitted its supplemental NDA to the FDA for OTC Rogaine. Included in the supplemental NDA were the results of the IV study and an application for a 3 year period of exclusivity.

The FDA approved Upjohn's supplemental NDA for the Rx-to-OTC switch on February 9, 1996. Upjohn's patent for minoxidil expired on February 13, 1996. On April 5, 1996, the FDA informed Upjohn by telephone that its claim of exclusivity was denied. On the same date the FDA approved ANDAs for OTC Minoxidil Topical Solution 2% for Intervenors Barre National and Lemmon. On April 9, 1996, the FDA approved a similar ANDA for Bausch & Lomb.

On April 12, 1996, Upjohn filed this action for declaratory and injunctive relief. Upjohn contends that the FDA's denial of its request for three years of market exclusivity and approval of the ANDA's prior to February 9, 1999, violates the market exclusivity provisions of the Act, was done arbitrarily and capriciously and not in accordance with law, was in excess of statutory authority, and constituted a taking of property without just compensation in violation of the Fifth Amendment.[1]

## II.

Upjohn's suit rests upon its contention that the FDA violated the Federal Food, Drug, and Cosmetic Act ("FD & C Act" or the "Act"), 21 U.S.C. § 301 *et seq.*, when it denied Upjohn a three year period of market exclusivity. The FD & C Act governs FDA approval of new drug products. In 1984 the Act was amended to foster competition in the drug industry by streamlining the procedure for approval of generic drugs. The amendments enable the FDA to approve bioequivalent or generic drugs through ANDAs that rely principally on the safety and effectiveness data developed and submitted by pioneer drug companies. 21 U.S.C. § 355(j). At the same time that it expedited approval of generic drugs, Congress recognized the need to protect the interests of the original

drug manufacturers and to provide incentives for the invention of new products. *Abbott Laboratories v. Young,* 920 F.2d 984, 985 (D.C.Cir.1990), *cert. denied,* 502 U.S. 819, 112 S.Ct. 76, 116 L.Ed.2d 49 (1991). The balance struck by Congress prohibits the FDA from approving any ANDAs for a period of three years following approval of a supplemental NDA if the supplemental NDA satisfies the following three conditions:

a. The supplemental NDA contains "reports of new clinical investigations" (other than bioavailability studies);

b. The new clinical investigation(s) are "essential to the approval of the supplement;" and

c. The new clinical investigation(s) were "conducted or sponsored by the applicant."

21 U.S.C. § 355(j)(4)(D)(iv); *see also* 21 C.F.R. § 314.108(b)(5).

## III.

In its request for preliminary injunction Upjohn requests an order restraining Defendant, pending disposition of this case, from approving any ANDAs for an OTC minoxidil product and ordering Defendant to suspend the effective date of any such ANDAs he has already approved.

In deciding a motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, this Court must consider these four familiar factors:

(1) the plaintiff's likelihood of success on the merits of its claim;

(2) whether the plaintiff will suffer irreparable harm without the injunction;

(3) whether granting the injunction will cause substantial harm to others; and

(4) the impact of the injunction on the public interest.

None of these factors, standing alone, is a prerequisite to relief. They are considerations to be balanced, not rigid and unbending requirements. *See, e.g., Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 653 (6th Cir. 1996); *Sandison v. Michigan High School*

---

1. Upjohn does not argue the Fifth Amendment taking claim in its request for preliminary injunction. The heart of this claim, however, rests on the same issue as the other claims, i.e., whether the FDA should have granted Upjohn an additional three years of marketing exclusivity under the FD & C Act.

*Athletic Ass'n,* 64 F.3d 1026, 1030 (6th Cir. 1995).

## IV.

Upjohn's likelihood of success on the merits of its claim that the FDA unlawfully refused to grant it a three year exclusivity period under provisions of the FD & C Act must be considered in light of the applicable standard of review. Under the Administrative Procedure Act the Court is required to hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Court's scope of review under the arbitrary and capricious standard is narrow. *Cincinnati Bell Tel. Co. v. Federal Communications Comm'n,* 69 F.3d 752, 758 (6th Cir.1995). "[T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Norwich Eaton Pharmaceuticals, Inc. v. Bowen,* 808 F.2d 486, 493 (6th Cir.1987) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (citations omitted)). The court may not concern itself with the wisdom of the agency action or substitute its judgment for that of the agency. *Id.* While the agency's decision is entitled to a presumption of regularity, that presumption does not shield the agency's actions from a thorough, probing, in-depth review. *Simms v. National Highway Traffic Safety Admin.,* 45 F.3d 999, 1003 (6th Cir.1995).

■ The starting point for reviewing an agency's action is consideration of the administrative record compiled by the agency.

Upjohn was informed of the decision by telephone on April 5, 1996. In a subsequent telephone conversation Dr. Lipicky of the FDA explained that the agency's view was that the IV minoxidil study was not essential. Upjohn was also informed that the agency would not be preparing an explanatory letter and that Upjohn should file an FOIA request for pertinent documents.

Upjohn received no written documentation of the FDA's decision on the exclusivity request prior to filing this suit. The FDA has now filed a certified copy of the administrative record of its exclusivity determination. That record includes the following:

1. A memorandum from Dr. Robert Temple, Director of FDA's Office of Drug Evaluation ("ODE I") and Associate Director for Medical Policy in FDA's Center for Drug Evaluation and Research ("CDER"), to Dr. Janet Woodcock, the CDER Director, dated March 20, 1996, in which Dr. Temple concluded that he would have approved OTC minoxidil without the IV study.

2. A March 25, 1996, memorandum from Dr. Woodcock to the Office of Generic Drugs ("OGD"), "transmitting Dr. Temple's assessment of the Upjohn IV minoxidil study's role in the OTC switch of the product for your evaluation in making the exclusivity decision."

3. A one-page checklist signed by Dr. Roger L. Williams, Director, Office of Generic Drugs, on April 2, 1996, recommending no exclusivity period.

The Court is appalled by the gaps in the administrative record. The documents presented do not provide a clear decision making path for the Court's consideration. Dr. Temple's memorandum concludes with a personal opinion that he would have approved OTC minoxidil without the IV study. Dr. Woodcock's memorandum merely forward's Dr. Temple's memorandum without a recommendation. The checklist is in the form of a recommendation. There is no indication on the form that it is the agency's final decision. Neither does it identify the rationale for the decision. The FDA orally advised Upjohn that its reasons are contained in the Temple memorandum, yet there is no indication that either Woodcock or Williams adopted the Temple memo. The checklist signed by Williams does not even mention the Temple memorandum.

The FDA's record of its decision making process is inferior to most administrative records this Court has reviewed. The Court is astounded that an agency of the importance and resources of the FDA has not given more attention to the development of a clear record for review. This lack of concern is

particularly surprising in a high profile case such as this where the FDA knew the matter was sensitive and likely to result in litigation and where the FDA had obtained assistance of legal counsel. The parties and the public deserve a better decisional record.

Nevertheless, given the FDA's certification of the administrative record, the sequence of the memoranda contained in the record, the fact that the Temple memorandum is consistent with Dr. Lipicky's oral explanation to Upjohn regarding the basis for the decision, and the fact that there is no dispute as to the FDA's ultimate conclusion on the issue of exclusivity, the Court is satisfied that it can look to Temple's memorandum as the expression of the agency's decision.

Moreover, Upjohn does not seek to have the matter remanded to the FDA for an explanation of its decision. (Plaintiff's brief in support of application for TRO and preliminary injunction, p. 12, n. 5). Instead of a remand, Upjohn requested the opportunity to put on evidence to show what had been omitted from the administrative record.

█ Although review of an agency decision is normally confined to the administrative record, "[c]onsideration of evidence outside the administrative record is proper under some circumstances, e.g., 'for background information ... or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision.'" *Norwich Eaton Pharmaceuticals, Inc. v. Bowen*, 808 F.2d 486, 489 (6th Cir.1987) (quoting *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980)).

The Court did allow Upjohn to put on evidence, and that evidence has been considered for purposes of this motion. Interestingly enough, the evidence presented was not in conflict with the administrative record, but instead supported it.

## V.

█ As stated earlier, there are three conditions for approval of a three-year exclusivity period. In this case there is no dispute that the IV test was a new clinical test or that the test was sponsored by Upjohn. The only issue for the Court's consideration is whether there was a rational basis for the FDA's determination that the IV test was not essential to approval.

Upjohn contends that the question of whether the test was essential is straight forward and calls for no scientific expertise: the IV test was essential because it was required by the FDA.

Upjohn's argument fails because it is not supported by the evidence presented. There is no question that the FDA expressed its safety concerns at the April 9, 1992, meeting. There is no evidence, however, that the FDA required Upjohn to conduct the IV study as a condition for approval of the Rx-to-OTC switch. The FDA minutes reveal that the FDA representatives expressed several areas of concern: (1) risk of misuse—"What if someone uses more than the labeled dose? What are the blood levels of Rogaine when there is an increase in absorption or gross over use?" (2) Dr. Botstein noted the need for a focused presentation on cardiovascular risks; and (3) Dr. Temple stated that given the nature of the benefits, a case must be made that there is no discernable risk in terms of serious adverse events.

Upjohn's minutes of the meeting similarly confirm that the FDA did not require the IV test as a condition of approval. R.A. Paarlberg noted that "Dr. Temple stressed that ROGAINE will have to be EXTREMELY safe for it to go OTC." R.J. Trancik noted that Dr. Temple wanted to know "the consequences of gross over-use of the drug," such as "10 times the recommended application." The only mention of the IV study in any of the minutes from the April 9, 1992, meeting occurred during the post-meeting with Dr. Lipicky in conjunction with a discussion on 5% topical minoxidil.

Upjohn also represents that at the 1992 meeting the FDA indicated that Upjohn's application would not be approved without additional safety data. Contrary to Upjohn's representations, there is no evidence that the FDA indicated that any additional studies would need to be done. The FDA merely described what should be included in the

supplemental NDA for the OTC switch. Dr. Temple stated that by now Upjohn should have enough information to determine whether the warnings about cardiovascular events should be removed from the physician's insert. Dr. Lipicky and Dr. Temple commented that they were familiar with the post-marketing surveillance study that had been done in conjunction with the Rx Rogaine, and that the data from the post-marketing study would support the safety of Rogaine.

The 1992 discussion clearly centered on what should be included in the submission, and was not designed to critique the studies or available data. That data was not then before the FDA—the supplemental NDA would not be filed for another year.

Nowhere is there any indication that the FDA ever suggested that the available data was insufficient or that the IV test was a necessary prerequisite for approval. In fact there was testimony from Upjohn's Dr. Data that subsequent to the meeting Upjohn seriously considered submitting the supplemental NDA without the IV study.

After submitting the supplemental NDA in 1993 with the completed IV study, Upjohn received numerous questions about the IV study from the FDA. The FDA's interest in the results of the study is not evidence that the FDA requested that the study be done. The FDA is not required to ignore evidence offered by a company in support of its request for approval merely because the evidence is not necessary to approval.

If the FDA did not require Upjohn to conduct the IV study as a condition to approval, was the IV study nevertheless essential to the FDA's ability to make its determination that Rogaine was safe for OTC use?

The FDA has defined the term "essential to approval" in its regulations:

Essential to approval means, with regard to an investigation, that there are no other data available that could support approval of the application.

21 C.F.R. § 314.108(a).

There is no question that the FDA had some safety concerns with respect to the OTC sale of Rogaine. Could that safety determination be made without reference to the IV test? Was there other available data which addressed FDA's concern about whether the margin of safety for topical minoxidil was sufficient to support OTC use?

These questions involve evaluation of the clinical trial and the scientific and medical significance of that trial to FDA's final determination. They bring the Court into the heart of a chemical and pharmacological debate that is within the peculiar expertise of the FDA. *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 653–54, 93 S.Ct. 2488, 2493–94, 37 L.Ed.2d 235 (1973). When examining scientific determinations within the agency's special expertise, the reviewing court must generally be at its most deferential. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). "The FDA is the agency charged with implementing the Food, Drug and Cosmetic Act as amended. Its judgments as to what is required to ascertain the safety and efficacy of drugs fall squarely within the ambit of the FDA's expertise and merit deference from us." *Schering Corp. v. Food and Drug Admin.*, 51 F.3d 390, 399 (3rd Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995).

The Court has reviewed Dr. Temple's 19–page memorandum devoted to the issue of whether Upjohn's IV study of minoxidil was essential to approval of OTC Rogaine. In this comprehensive memorandum Dr. Temple considered the fact that Dr. Lipicky, Director, Division of Cardio–Renal Drug Products, said that the IV study was essential to his approval recommendation because it helped answer questions about the safety of OTC minoxidil raised by the medical reviewer, Dr. Karkowsky. Dr. Temple also considered Dr. Karkowsky's safety review and the extent to which it analyzed and relied on the results of the IV study.

Dr. Temple agreed that in order to approve the Rx-to-OTC switch the FDA should have a high level of confidence that topical minoxidil will rarely, if ever, have significant hemodynamic effects. Nevertheless, he concluded that the IV study did not add signifi-

cantly to the FDA's ability to reach this conclusion because (1) the IV study did not add much information about concentration-response relationships, at least as analyzed, and (2) neither the IV or oral studies, as analyzed, shed light on individual responses—they do not help answer the question of whether the rare topical patients with concentrations in the 5–10 ng/ml range will have a response:

> My conclusion is that the original clinical data, including study 84, enhanced by 6 benign (so far as we can tell) years of marketing, and the cohort study, indicate a very satisfactory record of safety, one suitable for an OTC drug. This is not surprising given the documented large (order of magnitude) difference between blood levels after topical dosing and the blood levels associated with barely detectable effects (slight HR increase, no BP effect) after *oral* dosing with a 2.5 mg b.i.d. tablet. The IV study was not *essential* to this conclusion, although it supported it, because concentrations achieved overlapped with those in the study of oral minoxidil and gave little new information.

Upjohn contends that the Temple rationale is arbitrary and capricious because it relied on data available in or before 1988, prior to approval for Rx Rogaine and because the IV test was the only effective study to address the margin of safety issue. Upjohn also contends that the 6 benign years of Rx use are not very helpful to the safety issue because people with hypertension had been warned away from the drug through the package insert discussion on risk factors.

Upjohn's dispute with the Temple memorandum is fundamentally a scientific dispute in an area where this Court lacks expertise and is required to give the FDA great deference. It appears to this Court that although an opposite conclusion, i.e., that the IV test was essential, could have been supported on this record, Dr. Temple's decision did not come out of the blue. Prior to the final decision Upjohn learned that even Dr. Lipicky was leaning against exclusivity. The issue of exclusivity presented the agency with a close question that required more levels of agency attention than was routine.

In order for an agency action to survive judicial review the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). If the reasoning behind the agency's action is logical, that action must be allowed to stand, even if an alternative course of action would also be logical. *Norwich Eaton,* 808 F.2d at 493.

Dr. Temple's memorandum states in detail the grounds for the decision and the essential facts upon which the decision was based. It appears that he considered the statutory factors governing exclusivity, considered the relevant data, and arrived at a rational decision based upon the evidence. Nothing more is required. *See Upjohn Mfg. Co. v. Schweiker,* 681 F.2d 480, 483 (6th Cir.1982). The Court cannot say that the agency's determination that the IV test was not essential was arbitrary and capricious.

## VI.

It appears that Upjohn does not have a likelihood of success on its argument that the denial of its exclusivity application was arbitrary and capricious. The remaining factors for the Court to consider in its review of Upjohn's motion for preliminary injunction involve a balancing of the harms.

If a preliminary injunction is not entered, the Intervenor drug companies will immediately be able to begin competing in the market for OTC minoxidil. This will result in reduced sales and profits for Upjohn, damages which are not recoverable from either the FDA or the Intervenor drug companies. On the other hand, if a preliminary injunction is entered, the Intervenor drug companies will be prohibited from entering the market and will lose not only profits from sales, but also the important benefit of their early entry into the market. Of course, it must be recognized that the damages to both Upjohn and the Intervenors would be attributable to

calculated business risks. Both sides in this dispute expended substantial sums of money on this product before they knew whether the FDA would grant Upjohn's exclusivity request.

The public has two interests at stake: an interest in a competitive drug market and an interest in providing incentives for innovative research and development of new drugs. These competing interests have been considered by Congress and balanced in the 1984 amendments to the FD & C Act. In effect, the balancing of harms inquiry brings the Court back to its consideration of the likelihood of success on the merits. In light of the fact that Upjohn has not shown a likelihood of success on the merits, the Court does not believe injunctive relief is appropriate. Upjohn's motion for preliminary injunctive will accordingly be denied.

An order consistent with this opinion will be entered.

### ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Plaintiff The Upjohn Company's motion for preliminary injunction (Docket # 4) is **DENIED** and the previously entered Temporary Restraining Order (Docket # 9) is hereby **DISSOLVED.**