**MEAD JOHNSON PHARMACEUTICAL GROUP, MEAD JOHNSON & COMPANY, Appellant,**

v.

**Otis R. BOWEN, Secretary of H.H.S., et al.**

**No. 87–5099.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 25, 1988.

Decided Feb. 12, 1988.

Alan H. Kaplan, with whom Thomas O. Henteleff and Peter R. Mathers, were on the brief, for appellant.

Jacqueline H. Eagle, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., Thomas Scarlett, Chief Counsel, and David G. Adams, Associate Chief Counsel, Food and Drug Admin., and Margaret A. Cotter, Atty., Dept. of Justice, were on the brief, for appellees. Kenneth L. Jost, Atty., Dept. of Justice, also entered an appearance for appellees.

Before EDWARDS, BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

---

HARRY T. EDWARDS, Circuit Judge:

Mead Johnson Pharmaceutical Group ("Mead") appeals from a judgment of the District Court, 655 F.Supp. 53, upholding the Food and Drug Administration's ("FDA") denial of a citizen petition filed by Mead. At issue is whether Mead is entitled to a ten-year period of nonpatent exclusivity for its drug "Desyrel" under the Drug Price Competition and Patent Term Restoration Act. The answer to that question turns solely on whether Mead's New Drug Application ("NDA") for Desyrel was "approved" by the FDA before or after January 1, 1982. There is little dispute about the facts; rather, the case centers on the meaning of the term "approved."

We find the FDA's construction of the statutory term "approved" to be consistent with congressional intent; and, even if the term "approved" might be viewed as ambiguous, it is clear that the FDA's construction was a permissible one. We therefore affirm the judgment of the District Court.

## I. BACKGROUND

### A. *Statutory Background*

On September 24, 1984, the President signed into law the Drug Price Competition and Patent Term Restoration Act, Pub.L. No. 98–417, 98 Stat. 1585 (1984), generally known as the "Hatch–Waxman Amendments" to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* The purpose of this legislation was to increase competition in the drug industry by facilitating the approval of generic copies of drugs. The Amendments notably eliminated the requirement that generic copies of drugs approved after 1962 be supported by independent clinical research data. Rather than complete the full—and very expensive—NDA process, generic copiers could proceed via an "Abbreviated New Drug Application" ("ANDA"), which required merely a reference to the safety and effectiveness data submitted by the "pioneer" drug manufacturer, along with submission of manufacturing and bioequivalence data for the generic copy. *See* 21 U.S.C. § 355(j) (Supp. II 1984). The result was to make practical the manufacture of generic copies which theretofore had been uneconomical.

In order to compensate drug manufacturers who had invested in new drug development in reliance on the previous rules, as well as to provide continuing incentive for new drug research, the Amendments contained several provisions for varying periods of exclusivity before the FDA could approve ANDAs. One such provision is relevant to this case. As a transitional measure, the Amendments provided for a ten-year period of exclusivity for drugs "approved" by the FDA between January 1, 1982, and the enactment date of the Amendments, September 24, 1984. *See* 21 U.S.C. § 355(j)(4)(D)(i) (Supp. II 1984). Drugs approved later had shorter periods of exclusivity, while those approved before January 1, 1982, enjoyed no exclusivity at all.

### B. *The Desyrel NDA Approval*

Desyrel is Mead Johnson's trade name for Trazodone HCl, an antidepressant drug. Mead submitted a NDA for Desyrel in October 1978. On December 21, 1981, Dr. Marion Finkel of the FDA transmitted a letter to Mead informing it that review of the NDA was complete. This letter stated that approval would be forthcoming upon Mead's submission of revised printed labeling, in accordance with 4½ pages of detailed FDA comments. Letter from Marion J. Finkel to Mead Johnson and Company (Dec. 21, 1981), Joint Appendix ("J.A.") 150–54. Following several telephone conversations, Mead submitted revised labeling the next day, incorporating the FDA's requested changes. In its accompanying letter, Mead stated its understanding, based on the telephone discussions, that "final approved labeling can be submitted subsequent to the approval of the NDA." Letter from Frank W. Furth to Marion Finkel (Dec. 22, 1981), J.A. 123. More telephone conversations apparently ensued, and on December 24 the FDA sent Mead a letter which stated in relevant part:

We have completed our review of [the Desyrel] application as submitted with revised draft labeling on December 22, 1981 and have concluded the drug is safe and effective for use as recommended in the labeling. *Accordingly, the application is approved.*

As agreed to over the phone this approval is granted with the understanding that any remaining issues regarding validation will be promptly and satisfactorily resolved and that final printed labeling will be promptly submitted and revised as follows before the drug is marketed.

Letter from Marion J. Finkel to Mead Johnson and Company (Dec. 24, 1981) (emphasis added), J.A. 9. There followed five specific requests for minor changes in language under the label's description of adverse reactions (such as changing "memory loss" to "impaired memory"). *Id.*[1]

In the December 1981 supplement to its "Approved Prescription Drug Products" list, the FDA listed Desyrel as approved. J.A. 81, 90. In the December 1981 "FDA Drug and Device Product Approvals" list, the FDA also listed Desyrel with an approval date of December 24, 1981. J.A. 94.

On January 19, 1982, Mead submitted the final printed labeling for Desyrel to the FDA with a cover letter that referenced "Your letter of approval for Desyrel ... dated December 24, 1981." Letter from Robert F. Majewski to Marion Finkel (Jan. 19, 1982), J.A. 157. The FDA processed the final labeling as a "supplemental NDA." On February 1, 1982, in a letter to Mead signed by Dr. Paul Leber, a Division Director, the FDA stated: "We have completed our review and the supplement is approved." Letter from Paul Leber to Mead–Johnson Pharmaceutical Division (Feb. 1, 1982), J.A. 8.

After passage of the Hatch–Waxman Amendments, the FDA began to prepare for implementation by requesting drug manufacturers to submit information on their approved drugs. In response to such a request, Mead informed the FDA on October 22, 1984, that the approval date for Desyrel was December 24, 1981, and that it was not entitled to a period of statutory exclusivity. Letter from Marygayle Ritzert to Thomas J. McGinnis (Oct. 22, 1984), J.A. 129, 130. Six months later, however, on April 19, 1985—just days before its patent on the drug was to expire—Mead wrote to the FDA to inform it that it had "reviewed our NDA file for DESYREL," that it had determined that the proper approval date was February 1, 1982, and that it was therefore entitled to an exclusivity period until February 1, 1992. Letter from Donald G. Harris to Peter H. Rheinstein (Apr. 19, 1985), J.A. 11–12.

C. *Proceedings Below*

On June 20, 1985, Mead filed a citizen petition with the FDA, requesting that it recognize a ten-year exclusivity period for Desyrel. Citizen Petition of Mead Johnson Pharmaceutical Group, J.A. 3–7. The FDA rejected the petition in a letter issued August 15, 1985. It found that Desyrel had been approved on December 24, 1981. It stated that the December 24 letter had approved the NDA, with the understanding that final labeling would be submitted before the drug was marketed, but that the letter had "neither stated nor implied" that any further approval was necessary before the drug could be marketed. It added that agreement had been reached by telephone on the changes to be made, and that the ten-year exclusivity period depended only on the date of approval, not the date of marketing. The February 1 letter was clearly only an approval of a "labeling supplement" to a previously approved NDA; its author had had no authority to approve

---

1. In its denial of Mead's citizen petition, the FDA maintained that it and Mead had agreed by telephone on these five changes. Letter from Harry M. Meyer to Alan H. Kaplan (Aug. 15, 1985), J.A. 13, 14. The language of the December 24 letter ("As agreed to over the phone ...") would seem to support this position. In a litigation affidavit not part of the administrative record, however, Mead's Dr. Frank Furth denies that there had been any such telephone agreement. Declaration of Frank W. Furth (Mar. 20, 1986), J.A. 169, 172.

a NDA.[2] Letter from Harry M. Meyer to Alan H. Kaplan (Aug. 15, 1985), J.A. 13–15.

Mead submitted a Petition for Reconsideration on October 17, 1985, J.A. 20–43, which the FDA agreed to consider even though it was untimely. In its letter of December 12, 1985, denying the Petition for Reconsideration, Letter from Joseph P. Hile to Alan H. Kaplan (Dec. 12, 1985), J.A. 45–52, the FDA rejected Mead's argument that it had failed to consider provisions of the FDA's letter of December 21, 1981.[3] The agency maintained that the requirements contained in that letter had been modified by the ensuing telephone conversations between Mead and the FDA, as well as by the "approval" letter of December 24. J.A. 46–47. More generally, the FDA stated that, in accordance with 21 C.F.R. § 314.105,[4] its policy had always been that "the date of the approval letter is the date of approval of the application." J.A. 49. In addition, the FDA emphasized that

> under the provisions of the agency's letter of December 24, 1981 the petitioner could have prepared final printed labeling, incorporating the appropriate changes, and marketed the product without additional agency action at anytime. Thus, contrary to petitioner's allegation Desyrel could have legally been marketed prior to January 19, 1982.

J.A. 50.

Finally, the FDA pointed out that at the time of the passage of the Hatch–Waxman Amendments, it had been a matter of public record (through information contained in FDA publications) that Desyrel had been approved on December 24, 1981. Thus, if Congress had intended Desyrel to enjoy the ten-year exclusivity provision, "it presumably would have selected a different cut-off date than it did." J.A. 51.

Several days after the FDA's denial of the Petition for Reconsideration, Mead filed a complaint in the District Court, seeking preliminary and permanent injunctions and declaratory relief. The District Court denied the request for a preliminary injunction, *Mead Johnson Pharmaceutical Group v. Bowen*, 655 F.Supp. 53 (D.D.C. 1986), *reprinted in* J.A. 158–68, and subsequently granted the Government's motion for summary judgment, holding that the FDA's denial of Mead's citizen petition was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *Mead Johnson Pharmaceutical Group v. Bowen*, No. 85–3971 (D.D.C. Jan. 27, 1987), *reprinted in* J.A. 213–25. Mead now appeals that decision.

## II. ANALYSIS

This case presents "a pure question of statutory construction, [on which] our first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation must be given effect...." *NLRB v. United Food & Commercial Workers Union, Local 23,* —— U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (quoting *INS v. Cardoza–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987)). If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," *Chevron U.S.A. v. Natural*

---

**2.** The FDA pointed out that Dr. Leber, the author of the February 1 letter, was a Division Director, and as such was authorized to approve a supplemental NDA, but not a NDA itself. Thus, it stated, if Mead was correct that the Desyrel NDA had not been approved on December 24, then it had never been approved at all. J.A. 14–15. Subsequently, Mead shifted its argument and maintained that "approval" had taken place when it submitted the final labeling on January 19.

**3.** That letter had included the following statements: "Before the application may be approved, it will be necessary for you to submit revised printed labeling in accordance with our comments...." J.A. 150. "If additional information relating to the safety or effectiveness of this drug becomes available before we receive final printed labeling, revision of that labeling may be required." J.A. 154.

**4.** 21 C.F.R. § 314.105 (1981), as it existed in 1981–82, provided that when there was no longer any ground for denying approval, "the applicant shall be notified in writing that the application is approved and the application shall be approved on the date of the notification." The present version, 21 C.F.R. § 314.105(a) (1987), provides: "The date of the agency's approval letter is the date of approval of the application."

*Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), then the question for us becomes whether the FDA's construction of the statute is "permissible," *id.,* that is, one that is "rational and consistent with the statute." *United Food & Commercial Workers,* 108 S.Ct. at 421. In the present case, we find the FDA's interpretation of the statutory term "approved" in 21 U.S.C. § 355(j)(4)(D)(i) to be consistent with congressional intent; and, even if the term "approved" might be viewed as ambiguous, we have no doubt that the FDA's construction of it was a "permissible" one. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. Therefore, the agency's rejection of Mead's citizen petition cannot be held to be either "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982).

While the term "approved" is not defined in the statute, it had, at the time the Hatch–Waxman Amendments were enacted, a precise and undisputed meaning. By regulation the FDA had specified that "the applicant shall be notified in writing that the application is approved and *the application shall be approved on the date of the notification.*" 21 C.F.R. § 314.105 (1981) (emphasis added).[5] As the District Court pointed out, the precise date of an "approval" was of great concern to the FDA, the NDA applicant, and competing drug manufacturers, even before the Hatch–Waxman Amendments. *Mead Johnson* (Jan. 27, 1987), slip op. at 10, J.A. 222. The FDA's regulation on this point thus reflected a well-considered, long-standing policy. We have found absolutely

no reason to believe that Congress intended the term "approved" in the Hatch–Waxman Amendments to mean anything other than what the FDA understood it to mean.

It is undisputed that the FDA notified Mead that the Desyrel NDA was "approved" on December 24, 1981. Moreover, *both* the FDA and Mead considered approval to have taken place on that date. Indeed, Mead opens the "argument" section of its brief with this statement: "Mead Johnson does not dispute that, until enactment of the Hatch–Waxman Amendments, all parties including Mead Johnson were content to regard the DESYREL NDA as having been 'approved' as of December 24, 1981." Brief of Appellant at 14. Nor does Mead argue that, after December 24, any further action by the FDA was required before it could legally market the drug. Mead's counsel conceded at oral argument that, had Mead submitted the final labeling on December 26, it could then have marketed the drug without further agency action. And it is clear from Mead's letter of December 22, 1981, referring to the parties' understanding that "final approved labeling can be submitted subsequent to the approval of the NDA,"[6] that neither Mead nor the FDA regarded the submission of such labeling as a precondition to "approval."[7]

We note finally that the Sixth Circuit last year decided a case virtually identical to this one. *Norwich Eaton Pharmaceuticals, Inc. v. Bowen,* 808 F.2d 486 (6th Cir. 1987). There, a drug manufacturer's NDA was approved on December 29, 1981, via a letter similar to the one at issue here,[8] but

---

**5.** The FDA once considered approval to take place only upon satisfaction of any conditions contained in the notification of approval, *see* 21 C.F.R. § 130.10 (1963), but in 1963 that policy was replaced by the current one. *See* 28 Fed. Reg. 6377, 6381 (1963). The pre–1963 definition is precisely the one Mead now urges on this court—twenty-five years too late.

**6.** Letter of Frank W. Furth to Marion Finkel (Dec. 22, 1981), J.A. 123.

**7.** While the parties' subjective expectations are, of course, not dispositive of what Congress meant by the term "approved," they strengthen our conviction that there is no reason to believe

Congress would have intended any definition other than that followed by the FDA. And Mead's December 22 letter certainly disposes of the argument that "it was well-established agency policy [in 1981] that final printed labeling had to be submitted and approved before an 'approval' letter would be sent." Brief of Appellant at 19.

**8.** Mead attempts to distinguish the *Norwich* case on the ground that the FDA's letter there requested submission of the final labeling "when available." 808 F.2d at 492. Thus, Mead argues, Norwich's approval letter "did not contain any requirement that the final labeling be submitted to the agency prior to marketing the

the final labeling was submitted to the FDA only in June 1985.[9] Nonetheless, the court had no difficulty in holding that the FDA's determination that the drug had been approved on December 29, 1981, was based on a permissible interpretation of the statute. We find ourselves in full agreement with the Sixth Circuit.

CONCLUSION

We hold the FDA's interpretation of the term "approved" in 21 U.S.C. § 355(j)(4)(D)(i) to be consistent with congressional intent; and, even if the term "approved" might be viewed as ambiguous, it is clear that the FDA's construction was a permissible one. Accordingly, the judgment of the District Court is

*Affirmed.*

product." Brief of Appellant at 22. We fail to perceive any meaningful distinction in this context between the terms "when available" and "before the drug is marketed."

9. The lengthy delay in that case was due to negotiations over the drug's status as a controlled substance.