114 F.3d 1222
 325 U.S.App.D.C. 14
 STATE OF CALIFORNIA and Pete Wilson, Governor of the State
of California, Appellants
v.
DEPARTMENT OF JUSTICE and Janet Reno, Attorney General of
the United States of America, Appellees.
 No. 96-5264.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 28, 1997.
Decided June 3, 1997.
 
 [325 U.S.App.D.C. 15] Appeal from the United States District Court for the District of Columbia (No. 96cv00411).
 Evelyn M. Matteucci, Deputy Attorney General, argued the cause for appellants, with whom Linda A. Cabatic, Supervising Deputy Attorney General, Sacramento, CA, was on the briefs.
 Mark B. Stern, Attorney, U.S. Department of Justice, argued the cause for appellees, with whom Frank W. Hunger, Assistant Attorney General, and Eric H. Holder, Jr., U.S. Attorney, Washington, DC, were on the brief.
 Before GINSBURG, HENDERSON and TATEL, Circuit Judges.
 Opinion of the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 The State of California and Governor Pete Wilson appeal the dismissal of their complaint alleging that Attorney General Janet Reno failed to satisfy her statutory duty under 8 U.S.C. § 1252(j) either to incarcerate undocumented criminal aliens in federal prisons [325 U.S.App.D.C. 16] or to reimburse California for the costs that it incurs to incarcerate such aliens. The appellants seek a declaratory judgment that the Attorney General's inaction under § 1252(j) was arbitrary and capricious, in violation of the Administrative Procedure Act, and a writ of mandamus and injunctive relief compelling the Attorney General either to enter into a contractual arrangement to reimburse the State for its costs of incarcerating undocumented criminal aliens or to take federal custody of those aliens for whom no reimbursement is provided. The district court denied the appellants' motion for summary judgment and granted the appellees' motion to dismiss this case pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief could be granted. For the reasons that follow we affirm the district court's decision to dismiss the appellants' APA claim as unripe and to dismiss on the merits their claims for declaratory, injunctive, and mandamus relief.
 
 I. BACKGROUND
 
 2
 In 1994 Congress passed the Violent Crime Control and Law Enforcement Act, which amended § 242 of the Immigration and Nationality Act, in order to address the problem of States having to pay the costs of incarcerating undocumented criminal aliens. Among other things, the 1994 Act provides:
 
 
 3
 (a) INCARCERATION.--Section 242 of the Immigration and Nationality Act (8 U.S.C. § 1252) is amended by adding at the end the following new subsection:
 
 
 4
 "(j) INCARCERATION.--
 
 
 5
 "(1) If the chief executive officer of a State ... exercising authority with respect to the incarceration of an undocumented criminal alien submits a written request to the Attorney General, the Attorney General shall, as determined by the Attorney General--
 
 
 6
 "(A) enter into a contractual arrangement which provides for compensation to the State ... with respect to the incarceration of the undocumented criminal alien; or
 
 
 7
 "(B) take the undocumented criminal alien into the custody of the Federal Government and incarcerate the alien.
 
 
 8
 ...
 
 
 9
 "(5) There are authorized to be appropriated such sums as may be necessary to carry out this subsection, of which the following amounts may be appropriated from the Violent Crime Reduction Trust Fund:
 
 
 10
 ...
 
 
 11
 (B) $300,000 for fiscal year 1996."
 
 
 12
 Pub.L. No. 103-222, 108 Stat. 1823, § 20301(a) (codified at 8 U.S.C. § 1252(j)). In addition, the Act provides:
 
 
 13
 (c) TERMINATION OF LIMITATION.--Notwithstanding section 242(j)(5) of the Immigration and Nationality Act [8 U.S.C. § 1252(j)(5) ], as added by subsection (a), the requirements of section 242(j) of the Immigration and Nationality Act, as added by subsection (a), shall not be subject to the availability of appropriations on and after October 1, 2004.
 
 
 14
 Pub.L. No. 103-322, 108 Stat. 1824, § 20301(c).*
 
 
 15
 In December 1995 Governor Wilson sent a letter to General Reno requesting that she either enter into a contractual arrangement to compensate California for the costs it has incurred in incarcerating undocumented criminal aliens or take custody of those individuals. In January 1996 the Attorney General replied that she could not do so because the Congress had not appropriated any funds for that purpose. The California Department of Corrections then attempted to transfer an incarcerated criminal alien to the Immigration and Naturalization Service Processing Center in El Centro, California, but the INS refused to take custody of the prisoner. In March 1996 Governor Wilson reiterated his demand that General Reno proceed under § 242(j), and on the same day filed this action.
 
 
 16
 In April 1996 the Congress appropriated $500 million to implement the requirements [325 U.S.App.D.C. 17] of § 242(j) during Fiscal Year 1996. See 42 U.S.C. § 13710. In July of that year the Department of Justice announced a grant procedure by which it would distribute this $500 million pro rata to the States incurring costs for the incarceration of undocumented criminal aliens, but it would not incarcerate any of those aliens in federal prisons. 61 Fed.Reg. 38218 (July 23, 1996).
 
 
 17
 In their complaint the appellants ask that the court declare arbitrary and capricious the Attorney General's decision not to take custody of or provide compensation for the incarceration of every undocumented criminal alien incarcerated by the State of California, and that we order the Attorney General to do so. California alleges that it spends at least $400 million each year incarcerating undocumented criminal aliens.
 
 
 18
 In a ruling from the bench on August 8, 1996 the district court denied California's motion for summary judgment and granted the Attorney General's motion to dismiss this case pursuant to Fed.R.Civ.P. 12(b)(6). The court rejected California's reading of § 242(j), under which the Attorney General's obligation is not limited by the amount of money appropriated specifically to implement the statute:
 
 
 19
 If the language of Section 20301(c), that the Attorney General's authority under Section [242(j) ] should not be subject to the availability of appropriations on or after October 1st, 2004, is to have any meaning at all, it must mean that prior to that date the Attorney General's authority under the statute is subject to the availability of appropriations.
 
 
 20
 The court then held that § 20301(c) limits not only the Attorney General's authority to compensate the States but also her authority to incur costs by taking incarcerated aliens into federal custody. Accordingly, the court concluded, because the Congress had not appropriated any funds for these purposes when California requested that the Attorney General act, the court could not require the Attorney General to comply with the State's request. Finally, the court dismissed California's APA claim as unripe because the Attorney General had not yet distributed any funds pursuant to its July 1996 regulation.
 
 II. ANALYSIS
 
 21
 The central issue in this case is whether, prior to Fiscal Year 2005, the Attorney General's obligations under § 242(j) are subject to the availability of appropriations. Each party maintains that the meaning of the statute is clear and favorable to its position.
 
 
 22
 Before choosing between their proffered readings, however, we affirm the district court's dismissal of the appellants' APA claim as unripe. Under the APA, we review only "final agency action." 5 U.S.C. § 704; Franklin v. Massachusetts, 505 U.S. 788, 796, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). An agency action is final only if it "imposes an obligation, denies a right, or fixes some legal relationship." Action on Smoking & Health v. Department of Labor, 28 F.3d 162, 165 (D.C.Cir.1994). The DOJ had done nothing of that sort as of the time of the district court's decision. The Attorney General had indicated that she would exercise only the reimbursement option under § 242(j) and that she would spend $500 million to do so, but she had not yet made a final decision about how much money would go to California. No final administrative decision, no judicial review.
 
 
 23
 We affirm on the merits the district court's dismissal of the appellants' claims for mandamus, declaratory, and injunctive relief. Section 242(j)(1) initially requires the Attorney General either to incarcerate in a federal prison or to pay the cost of incarcerating in state prison each and every undocumented criminal alien. A legislated note to § 242(j) clearly implies, however, that the Attorney General's duty to fulfill this statutory mandate is limited by the availability of appropriated funds: "the requirements of section 242 of the Immigration and Nationality Act ... shall not be subject to the availability of appropriations on and after October 1, 2004." 108 Stat. 1824, § 20301(c). The appellants argue that § 20301(c), in providing only that appropriations shall not limit the requirements of § 242(j) as of FY 2005, speaks not at all to the Attorney General's obligations in prior fiscal years, and therefore does nothing to undercut the facial mandate of § 242(j).
 
 
 24
 [325 U.S.App.D.C. 18] The appellants' reading of § 20301(c) is not in harmony with the statute as a whole. If before FY 2005 the Attorney General's duty to act pursuant to § 242(j) were not limited by the availability of appropriated funds, then there would have been no reason for the Congress specifically to have provided that such would continue to be the case in FY 2005 and beyond. To blink at that implication would be to reduce the role of § 20301(c) to mere surplusage, contrary to a first principle of statutory construction. Qi-Zhuo v. Meissner, 70 F.3d 136, 139 (D.C.Cir.1995).
 
 
 25
 As a fallback position the appellants contend that even if § 20301(c) makes the availability of appropriated funds the measure of the Attorney General's powers under § 242(j), the want of an appropriation limits only her authority to reimburse the States for their costs of incarcerating aliens, not her authority to take state-incarcerated aliens into federal custody. The appellants argue that § 20301(c) need not be read to limit the Attorney General's obligation to take custody of state-incarcerated criminal aliens because the Attorney General could use the funds appropriated for the federal prison system generally in order to pay for their incarceration. As we have just seen, however, § 20301(c) makes "the requirements of section 242(j) of the Immigration and Nationality Act" subject to the availability of appropriations, and at the risk of belaboring the obvious we must point out that § 242(j) encompasses both the federal reimbursement option under § 242(j)(1)(A) and the federal incarceration option under § 242(j)(1)(B). In other words, § 20301 does not require the Attorney General either to reimburse the States or to use funds to incarcerate aliens beyond the amount appropriated by the Congress specifically for those purposes--until October 1, 2004, that is.
 
 
 26
 The appellants argue next that even if the statute requires the Attorney General to act under § 242(j) only to the extent of available appropriations, she has still violated the statute because she has decided to pay each State a percentage of its total costs of incarceration rather than to pay each State in full for a specified percentage of its alien inmates, and because she has undertaken to reimburse the States through grants rather than through "a contractual arrangement." We do not understand the practical import of the first objection; whether the Attorney General reimburses California so much per capita, but less than the State's full cost, or for a specified percentage, but less than all, of its total costs of incarceration would not affect the amount of money that California would receive. California's objection to the Attorney General's use of the grant mechanism is also without merit because the grant mechanism the Attorney General has established does involve a "contractual arrangement," specifically a unilateral contract. See 1 Williston on Contracts § 65 (3d ed.1957) ("An offer for a unilateral contract generally requires an act on part of the offeree to make a binding contract. This act is consideration for the promise contained in the offer and doing it with intent to accept without more will create a contract."); see also United States ex rel. Modern Elec., Inc. v. Ideal Electronic Security Co., 81 F.3d 240, 241 (D.C.Cir.1996) (noting the "well-recognized" principle that "in a unilateral contract, performance constitutes acceptance of an offer"). Here the offer is the Attorney General's promise to distribute to each qualified State that applies a share of the funds appropriated to implement § 242(j); the act requested in return is the fulfillment of the requirements set forth in the application kit. See 61 Fed.Reg. 38218. When a State fulfills those requirements and submits its application to the Attorney General, its performance will constitute both consideration for the Attorney General's promise and a manifestation of its assent; a binding contract will have been created. Therefore, California has no cause to complain about the procedure that the Attorney General has adopted to implement § 242(j).
 
 III. CONCLUSION
 
 27
 For the foregoing reasons, the order of the district court dismissing as unripe the appellants' claim under the APA and dismissing on the merits the appellants' claim for mandamus and injunctive relief is
 
 
 28
 Affirmed.
 
 
 
 *
 Subsection 20301(c), although codified only as a note to 8 U.S.C. § 1252(j), is an integral part of the Act as it appears in the Statutes at Large