**PFIZER INC, Plaintiff,**

v.

**Donna SHALALA, Secretary, United States Department of Health and Human Services, United States Department of Health and Human Services, Michael Friedman, M.D., Acting Commissioner, Food and Drug Administration, United States Food and Drug Administration, Defendants,**

and

**Mylan Pharmaceuticals, Inc., Penwest Pharmaceutical Group, Defendant–Intervenors.**

No. Civ.A. 97–1554 (PLF).

United States District Court, District of Columbia.

April 16, 1998.

Bruce Gary Joseph, Bert W. Rein, Wiley Rein & Fielding, Washington, DC, for Pfizer Inc.

Drake Cutini, U.S. Dept. of Justice, Washington, DC, for DHHS.

E. Anthony Figg, Rothwell Figg Ernst & Kurz, Washington, DC, for Def/Intervenor Mylan.

John R. Fleder, David L. Durkin, Olsson Frank and Weeda, PC, Washington, DC, for Def/Intervenor Penwest and Nat. Assn. Of Pharmaceutical Mfg.

Donald R. Stone, McKenna & Cuneo, Washington, DC, for Def/Intervenor National Pharmaceutical Alliance.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This matter initially came before the Court on plaintiff's motion for preliminary injunction. After oral argument on August 1, 1997, the parties agreed to convert the motion for preliminary injunction into a motion for summary judgment. The federal defendants, Donna Shalala, the United States Department of Health and Human Services, Michael Friedman and the United States Food and Drug Administration, and defendant-intervenors, Mylan Pharmaceuticals, Inc. and Penwest Pharmaceutical Group, filed oppositions to plaintiff's motion for summary judgment. The federal defendants also filed a motion to dismiss, and the defendant-intervenors filed cross motions for summary judgment. Amicus briefs in support of the defendants were filed by the National Pharmaceutical Alliance and the National Association of Pharmaceutical Manufacturers.

Upon consideration of all the papers filed by the parties and the arguments presented, the Court denies plaintiff's motion for summary judgment and enters judgment for defendants. An Order and Judgment was entered for defendants on March 31, 1998. The reasons for that decision are set forth herein.

## I. BACKGROUND

Plaintiff Pfizer, Inc. brings this action in hopes that this Court will order the FDA to reject the abbreviated new drug application ("ANDA") that Mylan Pharmaceuticals, Inc. has filed in support of a generic version of a sustained-release nifedipine tablet. Pfizer is the company that first developed the non-generic or pioneer version of this drug.

Pfizer maintains that the FDA received Mylan's ANDA in derogation of the prerequisites imposed by statute and by FDA's own regulations regarding the receipt of ANDAs for generic drugs. It argues that it is not permissible under the Federal Food, Drug, and Cosmetic Act for the FDA to permit two drugs that deliver their active ingredients by different means to be considered the "same" dosage form. Pfizer therefore asks the Court to order the FDA to overhaul its system of classifying the dosage forms of drugs.

Pfizer's pioneer drug, Procardia XL, is a controlled release drug in which the full dose of the active ingredient in the drug, nifedipine, is released slowly, over time. Nifedipine is a drug used in the management of angina and hypertension. Complaint ¶ 22. There are several mechanisms used in controlled release oral drugs in order to regulate the release of a drug's active ingredients. Procardia XL uses a patented oral osmotic pump release mechanism to release the nifedipine it contains. Osmotic release systems function by slowly releasing the drug's active ingredients from a shell; a pump or push component inside the shell swells when gastrointestinal fluid enters the shell to expel the active ingredient. Procardia XL's osmotic pump device is covered by four patents, and the size of the nifedipine crystals used in the drug is also patented.[1]

### A. The Statutory and Regulatory Regime

Pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, manufacturers like Pfizer who are seeking to market a new drug generally must submit to the FDA a full new drug application ("NDA"), which requires substantial clinical studies demonstrating the drug's safety and efficacy in patients suffering from the condition for which the drug is intended. *See* 21 U.S.C. § 355(b)(1)(A); 21 C.F.R. § 314.50. If the new drug is found to be safe and effective after extensive, detailed review by the FDA, approval is given to market the drug for the specific condition in a specified dosage form at a specified strength by a specified route of administration. *See* 21 C.F.R. § 314.50(a). The FDA approved Pfizer's NDA for Procardia XL on September 6, 1989.

Congress also has passed legislation that provides an alternative, "abbreviated" application procedure for certain generic imitations of NDA-approved drugs, or pioneer drugs. 21 U.S.C. § 355(j). These statutory provisions were added to the Federal Food, Drug, and Cosmetic Act through the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (1984), generally known as the "Hatch–Waxman Amendments." Pursuant to these amendments,

> a producer of generic drugs may file applications that rely heavily on approved applications for "listed" (generally name-brand) drugs.... This expedited process permits generic drug applications to piggy-back on clinical findings that FDA has already embraced. Accordingly, the application must demonstrate, among other things, that the generic drug is the "bioequivalent" of the listed drug and that it is properly manufactured and labeled.

*In re Barr Laboratories*, 930 F.2d 72, 73 (D.C.Cir.), *cert. denied*, 502 U.S. 906, 112 S.Ct. 297, 116 L.Ed.2d 241 (1991). This piggy-backing process spares applicants attempting to market generic versions of FDA-approved pioneer drugs the need to repeat the time-consuming and costly investigations that were necessary to establish the safety and efficacy of the pioneer drug. Instead, generic applicants may submit an abbreviated new drug application ("ANDA") containing, among other things, "information to show that the ... dosage form ... [is] the

---

1. The osmotic pump consists of a shell that passes through the body intact. The shell contains a tiny laser-drilled hole on one side. Inside the shell are two layers. The layer closest to the hole contains the active drug ingredient. A "push" layer is located below the active layer, separated by a membrane. As fluid from the gastrointestinal tract enters through the shell, it dissolves the active ingredient and causes the push layer to swell at a predetermined rate, thereby expelling the active ingredient through the laser-drilled hole into the gastrointestinal tract. Complaint ¶ 20. Plaintiff asserts that the use of the osmotic pump release system is especially beneficial in administering nifedipine. Complaint ¶ 22.

same as" the pioneer drug and "information to show the [generic] drug is bioequivalent" to the pioneer drug. 21 U.S.C. § 355(j)(2)(A)(iii) and (iv). The pioneer drug previously approved by the agency is referred to as the "listed drug" or "reference listed drug." 21 U.S.C. § 355(j)(2)(A)(i).

Under the FDCA and FDA regulations, the ANDA procedure is only available after the FDA makes a "threshold determination that the ANDA is sufficiently complete to permit a substantive review." 21 C .F.R. § 314.101(b)(1). An ANDA must contain, *inter alia*, information to show that (1) the active ingredient(s), (2) the route of administration, (3) the dosage form, and (4) the strength of the proposed generic drug are the "same as" those of the pioneer drug. 21 U.S.C. § 355(j)(2)(A)(ii) and (iii); 21 C.F.R. § 314.94(a)(5) and (6).[2] If the FDA finds that the ANDA "on its face" contains this required information, then the FDA proceeds to the more in depth substantive review phase of the ANDA process to determine whether to approve the proposed generic drug for marketing and use. If, on the other hand, the FDA determines that an ANDA does not "on its face" contain certain required information, the FDA may refuse to receive it, and the review process stops there. 21 C.F.R. § 314.101(d)(3).

An applicant seeking approval of a drug that is *similar* but not identical to the pioneer drug with respect to its active ingredients, route of administration, dosage form or strength must first seek permission from the FDA to use the ANDA procedure. The applicant must file and the FDA must approve a "suitability petition" before it is allowed to file an ANDA. 21 U.S.C. § 355(j)(2)(C); 21 C.F.R. § 314.93. The suitability petition permits the FDA to assess the differences between a generic imitation and the reference listed drug and to determine whether other tests or independent clinical trials are necessary to demonstrate the product's safety and efficacy and whether labeling varying from

the labeling of the reference listed drug is appropriate. 21 U.S.C. § 355(j)(2)(C)(i); 21 C.F.R. § 314.93. Only after the approval of a suitability petition may an ANDA be filed for a generic drug that has only similar—but not the same—active ingredients, route of administration, dosage form or strength. 21 U.S.C. 355(j)(2)(C).

If the FDA accepts an ANDA as being properly filed, either because it is sufficiently complete on its face or because a suitability petition has been approved, the FDA then proceeds to the substantive review stage. During the substantive review stage, the FDA goes beyond its preliminary threshold determination and this time thoroughly reviews the sufficiency of the ANDA's information. The applicant must show, *inter alia*, that the generic product (1) has the same active ingredients, route of administration, dosage form and strength as the pioneer drug, (2) is bioequivalent to the pioneer drug, and (3) is safe under the conditions prescribed, or, in the case of an ANDA that has been filed subsequent to the approval of a suitability petition, the ANDA must contain sufficient information about the particular aspect of the drug that is different from the pioneer drug. 21 U.S.C. § 355(j)(3). If, after substantive review, the FDA determines that the information contained in the ANDA is in fact insufficient regarding any one of these criteria, the FDA will refuse to approve the ANDA. *Id.*

If the FDA finds that the information in the ANDA is sufficient under the FDCA and FDA regulations, it will approve the ANDA and issue a notice that the generic imitation is therapeutically equivalent to the reference listed drug. This notice typically permits the imitation to be sold by pharmacists to patients as a substitute for the (usually more expensive) reference listed drug and to be included on state and insurance company lists as a therapeutically equivalent substitute for the reference listed drug.[3]

2. FDA regulations state that the term "same as" means "identical." 21 C.F.R. § 314.92(a)(1).

3. If the FDA decides at any point that a proposed generic product varies from the pioneer drug in any of the four statutory categories (active ingredients, rate of administration, dosage form or

strength), it must conclude that the generic drug is only a "pharmaceutical alternative," not a "pharmaceutical equivalent." 21 C.F.R. § 320.1(c) and (d). This is a great disadvantage to a generic product manufacturer because many state laws require a generic product to be phar-

Along with its ANDA, an ANDA applicant must also submit a certification reflecting the applicant's conclusion that any relevant patents covering the pioneer drug have expired or are invalid and/or not infringed by the generic product. 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.95. The ANDA applicant must also notify the patent holder that its patents are the subject of an ANDA certification. Upon receiving the notification, the patent holder has 45 days to evaluate the merits of the ANDA applicant's certification. If the patent holder initiates patent litigation within that period, FDA approval of the ANDA is stayed for up to 30 months while the patent action goes forward. 21 U.S.C. § 355(j)(4)(B)(iii).

### B. *Procedural History of Pfizer's Complaint*

Pfizer contends that despite the statutory requirement limiting the ANDA process to drugs having the "same" dosage form (21 U.S.C. § 355(j)(2)(A)(iii)), and despite the FDA's own regulations interpreting this provision to require an "identical" dosage form (21 C.F.R. § 314.92(a)(1)), the FDA in fact accepts ANDAs for review without first approving a suitability petition when the dosage form is not the "same" or "identical" and that it has done so in this case. Complaint ¶ 25. Pfizer points out that the FDA has in fact stated: "FDA does not require that the generic and reference listed extended release products contain the same excipients [or inactive ingredients], or that the mechanism by which the release of the active drug substance from the formulation be the same." Gov't Mem. in Support of Mot. to Dismiss and in Opp'n to Preliminary Injunction, Ex. F (FDA Guidance: Oral Extended (Con-

trolled) Release Dosage Forms at 2 (Sept. 9, 1993)).

The government acknowledges that the dosage form of a generic drug must be the same as that of the pioneer drug, but it vigorously disputes plaintiff's interpretation of what "dosage form" means. While Pfizer argues that Mylan's generic product does not have the same dosage form as Pfizer's Procardia XL because Mylan's product does not utilize an osmotic pump system to release its active ingredient, the government and defendant-intervenors, Mylan and Penwest, maintain that the products do indeed have the same dosage form because they are both "extended release tablets." [4] The government emphasizes that when the FDA decides whether to accept an ANDA as filed, the inquiry into a proposed generic product's dosage form need go no further than this broad classification.

In an attempt to persuade the FDA to change its policies regarding the processing of ANDAs for controlled-release drugs, Pfizer filed a Citizen Petition on October 28, 1993. It argued that the FDA's policies are not in accordance with the law and are arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(a), because they treat allegedly different dosage forms as the "same." Pfizer maintained that any nifedipine extended-release drug product using an osmotic release mechanism should be categorized as having a distinct dosage form. Under this formulation, any proposed generic extended-release nifedipine product not utilizing the osmotic release system would be unable to meet the "same" dosage form requirement and would have to submit to the more lengthy suitability petition process. *See* Pfizer Citizen Petition at 3, Complaint, Ex. 1.[5]

maceutically equivalent to the pioneer drug before it may be substituted for the pioneer drug. *See* Gov't Mem. in Support of Mot. to Dismiss and in Opp'n to Preliminary Injunction at 5, 26 n. 8.

It is important to note that any drug manufacturer that seeks approval of a suitability petition before filing an ANDA is relinquishing the "pharmaceutical equivalence" label for its proposed generic product. Generic drugs that are approved through the suitability petition process can only meet the definition of a "pharmaceutical alternative," because the very filing of a suitability petition is an admission that the drug's

active ingredients, route of administration, dosage form or strength is different from that of the pioneer drug. *See* Gov't Mem. in Support of Mot. to Dismiss and in Opp'n to Preliminary Injunction at 8; 21 C.F.R. § 320.1(c) and (d).

4. The controlled release system used by Mylan's generic nifedipine drug is called TIMERx and was developed by defendant-intervenor Penwest Pharmaceutical Group.

5. Plaintiff supplemented its Citizen Petition three times, most recently on November 18, 1996. Gov't Opp'n to Pfizer's Mot. for Summary Judgment at 7.

On June 2, 1997, the FDA accepted for filing an ANDA submitted by Mylan Pharmaceuticals for a generic nifedipine extended release tablet. Gov't Mem. at 10. Unlike Pfizer's Procardia XL, Mylan's nifedipine product is a "conventionally-pressed" tablet that uses an extended-release system other than an osmotic pump to release its active ingredients. Complaint, Ex. 3 at 2–4 (June 6, 1997 letter to Pfizer Inc. from Roger L. Foster, Vice President and General Counsel, Mylan). Pfizer therefore argues that Mylan's ANDA cannot contain sufficient information to show that Mylan's generic product has the same dosage form as Procardia XL. Pfizer maintains that the FDA wrongfully accepted Mylan's ANDA as filed instead of requiring Mylan to first file a suitability petition. Pl.'s Mem. at 20–25.

The acceptance of Mylan's ANDA by the FDA and Pfizer's receipt of Mylan's notice that its patents are the subject of an ANDA began the 45–day period for Pfizer to determine whether to file an action for patent infringement. 21 U.S.C. § 355(j)(4)(B)(iii). Pfizer's deadline to file its patent infringement suit was, in fact, the impetus for filing its complaint and motion for preliminary injunction in this Court on July 8, 1997.

Pfizer claimed in this Court that the FDA had acted arbitrarily and capriciously and in violation of the law by (1) accepting Mylan's ANDA, (2) receiving and processing ANDAs for controlled release solid oral drug products that use a dosage form dissimilar to the reference listed drug without the submission and approval of a suitability petition, (3) treating all controlled release tablets as constituting the same dosage form despite a regulation requiring dosage forms to be "identical," and (4) failing to require that all suitability petitions arising from differences in the dosage form compared to the reference listed drug include a more detailed description. Complaint ¶¶ 41–45. Pfizer requested the Court to (1) order the FDA to return Mylan's ANDA, (2) enjoin the FDA from receiving any re-filing of Mylan's ANDA, (3) enjoin the FDA from receiving any new ANDA for a controlled release form of nifedipine that does not use an osmotic pump device, unless the ANDA is preceded by an approved suitability petition, (4) enjoin the FDA from receiving any new ANDA for a controlled release drug that uses a different release mechanism from that of the pioneer drug, unless preceded by an approved suitability petition, and (5) enjoin the FDA from considering or approving any suitability petitions arising from deviations from the dosage form of the pioneer drug, unless the suitability petition contains a "full statement" of "all relevant information." Complaint at 20–21.

Just before this Court heard oral argument on August 1, 1997, Pfizer brought its patent infringement suit against Mylan in the United States District Court for the Western District of Pennsylvania (Civil Action No. 97–1309), effectively suspending any FDA approval of Mylan's ANDA for up to thirty months—until the year 2000. See Mylan and Penwest Mem. in Opp'n to Pfizer Mot. for Summary Judgment and in Support of Mylan Mot. for Summary Judgment at 1–2. Quite plainly, plaintiff's decision to bring a patent infringement suit has dramatically changed the posture of this case. In fact, during oral argument plaintiff's counsel conceded the inherent weakness of its motion for emergency injunctive relief in light of the 30–month stay and the parties agreed to brief dispositive motions. Therefore, there really is no longer any need for the Court to determine whether plaintiff is entitled to preliminary injunctive relief.

## II. DISCUSSION

### A. *Ripeness and Standing*

■ The FDA has merely accepted Mylan's ANDA for filing. In so doing, it has made only a very preliminary determination with respect to Mylan's ANDA, so preliminary, in fact, that the FDA's determination may best be described as an acceptance to consider considering a product for approval. The FDA's acceptance of Mylan's ANDA as filed in no way indicates whether Mylan's ANDA ultimately will be approved or whether, after a more in-depth substantive review, the FDA will decide that Mylan's product is or is not truly the same dosage form as Procardia XL. The Court concludes that the FDA's acceptance of Mylan's ANDA as filed

does not have the requisite finality to permit judicial review. *See Federal Trade Commission v. Standard Oil Company of California,* 449 U.S. 232, 242, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (premature judicial review "is likely to be interference with the proper functioning of the agency and a burden for the courts.... Intervention [would] lead[ ] to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary") (internal citations omitted); *cf. California v. Department of Justice,* 114 F.3d 1222, 1225 (D.C.Cir.1997).[6]

■ To the extent that Pfizer's complaint is a challenge to the FDA's dosage form classification system itself, however, the Court does have jurisdiction. The FDA's rejection of Pfizer's Citizen Petition and its refusal to change the current dosage form classification system is final agency action justifying judicial review. *See Public Citizen Health Research Group v. Commissioner, Food and Drug Administration,* 740 F.2d 21, 34 (D.C.Cir.1984) ("[E]xcept for the narrow category of cases in which judicial review is specifically precluded ... when an agency denies a citizen petition requesting agency action the court can review the agency's reasons for denial.") (internal citation omitted).

Pfizer contends that Mylan's proposed generic drug does not have the "same" dosage form as that of Procardia XL as required by 21 U .S.C. § 355(j)(2)(A) and 21 C.F.R. § 314.94(a). Its argument is premised on the idea that drugs that use different active ingredient release mechanisms can never be the "same" dosage form. Because Mylan's product does not utilize an osmotic pump release mechanism, Pfizer maintains that Mylan's product can never be viewed as having the same dosage form as Procardia XL. It argues that the FDA's approach to dosage form classification is arbitrary and capricious agency action that cannot be reconciled with the FDCA.

The FDA has a fundamentally different view of dosage forms. According to the FDA, a drug's dosage form is not based on its release mechanism, but on its physical appearance and the way the drug is administered. FDA Response to Citizen Petition at 4 (Aug. 12, 1997); Admin.Rec. at 4. In the eyes of the FDA, Procardia XL and Mylan's product *do* have the same dosage form (at least for the preliminary purpose of accepting an ANDA for filing) because they are both extended release tablets. In its Response to Pfizer's Citizen Petition, the FDA stated:

> The 74 dosage form descriptions, including the descriptions "extended-release tablet" and "extended-release capsule," that are currently listed in the Orange Book have effectively served the public, the Agency, and the industry. The categories are useful in that they are sufficiently differentiated to make a reasonable distinction based on dosage form, which includes the appearance of the drug. However, the categories are also useful in that they are not so narrow as to be virtually product-specific. As a result, these categories have allowed the FDA to make threshold determinations that products have the same dosage form while encouraging manufacturers to develop innovative release technologies and allowing the public the benefit of safe and effective generic drug products.

Response at 6–7. The Court agrees that the FDA's view is reasonable and in no way inconsistent with the Federal Food, Drug, and Cosmetic Act.

### B. *APA Standard of Review*

The FDA's decision to leave the current dosage form classification system intact may be set aside only if that decision was arbitrary and capricious, not in accordance with the law, or unwarranted by the facts. 5 U.S.C. § 706(2)(A). This standard is highly deferential to the agency:

> [T]he Court must consider whether the decision was based on a consideration of

---

**6.** As the government points out, a ruling by the Court at this point "would permit companies to challenge the mere acceptance of an application [and] would result in an unwarranted disruption of the generic drug review process. Pioneer drug companies have ample opportunity to, and routinely do, bring actions against the [FDA] when generic drugs are finally approved." Gov't Opp'n at 16–17;

the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

 "[T]here is a presumption in favor of the validity of administrative action," and courts are particularly deferential when an agency is interpreting its own statute and regulations. *Ethicon, Inc. v. FDA,* 762 F.Supp. 382, 386 (D.D.C.1991); *see Berlex Laboratories, Inc. v. FDA,* 942 F.Supp. 19, 25 (D.D.C.1996) ("FDA's policies and its interpretation of its own regulations will be paid special deference because of the breadth of Congress' delegation of authority to FDA and because of FDA's scientific expertise."). Moreover, "[t]he FDA is to be accorded deference when it is evaluating scientific data within its technical expertise." *Bristol–Myers Squibb Co. v. Shalala,* 923 F.Supp. 212, 216 (D.D.C.1996); *see Troy Corp. v. Browner,* 120 F.3d 277, 283 (D.C.Cir.1997) (in reviewing complex, scientific or technical judgments, court has narrowly defined duty of holding agencies to "certain minimal standards of rationality"). Finally, where the governing statute fails to define a relevant term—in this case, "dosage form"—the question for the court is whether the agency's definition is "a permissible construction of the statute" in view of Congress' silence. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see Mead Johnson Pharm. Group. v. Bowen,* 838 F.2d 1332, 1336 (D.C.Cir.1988) (question for

court is whether FDA's construction is "permissible," that is, one that is "rational and consistent with the statute"). In order for this Court to set aside the FDA's decision to maintain its current dosage form classification system, it would have to conclude that the FDA's interpretation of the FDCA "either ran athwart a clear mandate of Congress, or was an unreasonable one." *Troy Corp. v. Browner,* 120 F.3d at 284.

 Pfizer contends that the FDA has articulated no meaningful rationale for its decision that extended release dosage forms can be properly categorized on the basis of appearance and route of administration rather than on the basis of the drug's release or delivery mechanism and that its decision is impermissible under the FDCA. It also argues that the FDA's dosage form classification system "ignores clear evidence in the administrative record that its extended release categorization system is 'outmoded and improper [and that the] FDA's scheme is rife with internal inconsistency." Pl.'s Reply at 15.[7] The Court disagrees.

The FDA has offered a more than rational explanation for interpreting "dosage form" the way it has for so many years and for maintaining its current dosage form classification system. Although neither the Congress in the FDCA nor the FDA itself in its regulations has specifically defined the term "dosage form," the manner in which the FDA defines dosage form and applies its definition is rational. It is governed primarily by a list of 74 dosage forms set forth in Appendix C of the FDA's *Approved Drug Product with Therapeutic Equivalence Evaluation,* 17th ed., commonly known as the "Orange Book." The Orange Book has been published by the FDA annually since 1979, and the categories

---

7. Pfizer maintains that the current dosage form classification system results in numerous safety concerns because different release mechanisms used with the same active ingredient may result in different therapeutic effects. Pl.'s Reply at 17. For example, plaintiff contends that if the FDA approves a generic form of nifedipine that has a non-osmotic pump dosage, unsuspecting patients could be given a drug that has a different rate of release from that of Procardia XL, resulting in danger to users of the drug. Pl.'s Mem. at 24. This is a bogus argument. FDA regulations already provide that the FDA will refuse to ap-

prove an ANDA if information shows that the inactive ingredients, such as a drug's release mechanism, make the product unsafe. 21 C.F.R. § 314.127(a)(8); *see also* 21 U.S.C. § 355(j)(3)(H). The regulations list several examples of proposed changes that may raise serious questions of safety for which the FDA could refuse to approve a generic drug. 21 C.F.R. 314.127(a)(8)(ii)(A). Among these changes is "the use of a delivery or modified release mechanism never before approved for the drug." 21 C.F.R. § 314.127(a)(8)(ii)(A)(5); *see* Admin.Rec. at 5 and n. 5.

have been periodically updated. FDA Response to Citizen Petition at 3; Admin.Rec. at 3. The FDA admits that while this list is not binding on it or on the pharmaceutical industry, it does serve as informal guidance to a generic company on what is considered to be the "same" or "identical" dosage form. The 74 types of dosage forms included in the Orange Book range from aerosols, capsules, emulsions and implants to shampoos, sprays, suspensions, tablets and tinctures. The FDA has subdivided some of the dosage form categories, including the tablet dosage form. One of the subcategories of the tablet dosage form is "extended release" tablet.[8]

Under the current system, if two drugs fall into the same dosage form in the Orange Book, such as "extended release tablet," the FDA makes a threshold determination that their dosage forms are the "same" and, all other information being sufficient, it will then accept a generic drug company's ANDA as being filed. In this case, the FDA has preliminarily decided that Mylan's ANDA contained enough information to enable the FDA to make a threshold determination that the dosage form of Mylan's drug (among other things) is the "same" dosage form as Procardia XL, an extended-release tablet.

This is where plaintiff's and defendants' dispute over the meaning of dosage form comes most starkly into focus. The government argues that so long as a generic drug falls within the same dosage form classification (as defined by the Orange Book) as the pioneer drug, it will meet the threshold dosage form "sameness" requirement. While the government admits that Procardia XL and Mylan's product have different release mechanisms, it contends that Procardia XL's special osmotic pump mechanism does not transcend the category of the extended-release tablet; therefore, even if Mylan's product does not utilize the same release mechanism, both Pfizer's and Mylan's drugs have the same dosage form. Gov't Mem. at 22–23. By contrast, Pfizer asserts that the FDA must create a new category of dosage form

to accommodate Procardia XL's osmotic release mechanism. Under Pfizer's revised dosage form classification scheme, Mylan's drug could not be the same dosage form as that of Procardia XL, because Procardia XL's dosage form would be "tablet, osmotic pump" instead of the more general "tablet, extended-release." Mylan therefore would be unable to file an ANDA in support of its product; it would have to file a suitability petition first, seeking permission to use the ANDA review process.

Pfizer's argument would require that any variation in a drug's release mechanism would result in the product having a different "dosage form." The FDA has made clear, however, that for extended-release products, the *mechanism* by which the active ingredients is released does not have to be the same for the generic and the listed drug so long as the dosage forms (i.e., the appearance and route of administration of the two drugs) are the same: "FDA does not require that the generic and reference listed extended release products contain the same excipients [inactive ingredients], or that the mechanism by which the release of the active drug substance from the formulation be the same." Guidance, Oral Extended (Controlled) Dissolution Testing (1993) at 2 (attachment F to Gov't Mem. in Support of Mot. to Dismiss). The FDA has long declined to distinguish "dosage forms" on the basis of a drug's release mechanism, and instead has considered the release mechanism to be part of the composition or formulation of a drug. *See* 57 Fed.Reg. at 17969; 21 C.F.R. § 314.127(a)(8)(ii)(A)(5); Admin.Rec. at 5–6. While generic drugs must have the same dosage form as the listed drug, there is no requirement that they have the same formulation. 21 C.F.R. § 320.1(c); *see United States v. Generix Drug Corp.*, 460 U.S. 453, 454–55, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983) ("The term 'generic drug' is used to describe a product that contains the same active ingredients but not necessarily the same excip-

---

8. The Orange Book describes two types of modified release dosage forms: extended-release and delayed release. There are seven types of tablets described in Appendix C of the Orange Book. The tablets described are: tablet; tablet, chewable; tablet, coated particles; tablet, delayed release; tablet, dispersable; tablet, effervescent; and tablet, extended-release. FDA Response to Citizen Petition at 4 n. 4; Admin.Rec. at 4.

ients [inactive ingredients] as a so-called 'pioneer drug.' ").

Under the current FDA regime, an ANDA sponsor therefore may submit an ANDA for a generic drug that has the same active ingredients, route of administration, strength and dosage form as the pioneer drug but a different formulation and, thus, a different release mechanism as the pioneer drug. Gov't Mem. in Support of Mot. to Dismiss at 6–7.[9] In fact, under FDA regulations, the definition of "pharmaceutical equivalents" is "drug. products that contain identical amounts of the identical active drug ingredient … in identical dosage forms, but not necessarily containing the same inactive ingredient." 21 C.F.R. § 320.1(c). This makes sense. If, for instance, a generic tablet that does not use the osmotic pump can perform the same extended release functions as Procardia XL, and can perform them safely, then it is logical that the generic drug would be approved as a generic equivalent of Procardia XL. What else would a generic drug be?

Despite plaintiff's claims to the contrary, there is nothing in the Federal Food, Drug, and Cosmetic Act to indicate that Congress intended the FDA to develop a dosage form classification system based on a drug's release mechanism.[10] When Congress passed the Hatch–Waxman Amendments the FDA already had an abbreviated drug application procedure in place that utilized a dosage form classification system that was not based on release mechanism differences. *See* 21 C.F.R. § 314.2 (1983); 57 Fed.Reg. 17950,

17950–51 (April 28, 1992); Admin.Rec. at 5. Congress' choice not to address or revisit the ongoing FDA system of classifying dosage forms strongly suggests both that it was aware of the system and that it did not intend to change it. *See City of New York v. FCC*, 486 U.S. 57, 67–68, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988); *Mead Johnson Pharm. Group v. Bowen*, 838 F.2d at 1336. Indeed, in light of the principal objectives of the Hatch–Waxman Amendments, this Court sees no reason why Congress would want to change the FDA's interpretation of dosage form or the application of that interpretation.

The overarching purpose of the Hatch–Waxman Amendments to the FDCA was "to make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962." H.R.Rep. No. 857 (Part I), 98th Cong., 2d Sess. at 14 (1984), *reprinted in* 1984 U.S.C.C.A.N. at 2647; *see Fisons Corp. v. Shalala*, 860 F.Supp. 859, 862 (D.D.C. 1994). The court of appeals for this Circuit has recognized the importance of a ready supply of low-cost generic drugs. As Judge Williams noted for the court in the *Barr* decision:

> Of course the "bioequivalents" of [generic drugs] are, by definition, already available—but at a higher price.... But for poorer people—the users for whom access to generic drugs is most important—a pecuniary saving on drugs may have important health benefits. The difference between sinking, say, 3% and 20% of one's

---

**9.** Mylan maintains that Pfizer improperly refers to statements in Mylan's Notice Certification letter to argue that Procardia XL and Mylan's generic nifedipine product do not have the "same dosage form." Mylan points out that its Notice letter states that Mylan's ANDA is for "nifedipine tablet, extended release"—the same dosage form as Procardia XL.

> What Mylan's notice letter also does is distinguish the precise formulation used by Mylan from the patents covering the formulation.... Pfizer confuses the issue by comparing Mylan's statement that the *precise formulation* of its product is substantially different from what is claimed in the listed patents to the FDA's regulatory determination that the *dosage form* (i.e., "nifedipine tablet, extended release") of the Mylan product is the same as that of the Pfizer product.

Mylan Mem. in Opp'n to Pfizer Mot. for Prelim. Inj. at 5–6 (emphasis in original).

**10.** Plaintiff bases its congressional intent argument on the doctrine of statutory construction *noscitur a sociis* —that a word is known by the company it keeps. Plaintiff contends that the other three statutory "identities" of a prospective generic drug (active ingredient, strength and route of administration) emphasize the potential therapeutic effects of a drug, and therefore that the FDA's interpretation of dosage form should be based on potential therapeutic effects, not physical appearance. The Court fails to see how this interpretation of dosage form could be extracted from the Act at all, especially when one looks at the Act and its objectives as a whole. *See infra.*

income into pharmaceuticals spells a large difference in the range of economically accessible food and shelter.

The prevalence of health insurance hardly disposes of these complications. Much of the American population is uncovered by medical insurance—predominantly, in all likelihood, people for whom access to generic drugs is especially important. Moreover, for those who do buy private health insurance, unavailability of generic drugs spells higher premiums and again less income available for food, shelter, and every other item that may contribute to health and well-being. Similarly, given limits on congressional and taxpayer willingness to subsidize health care, the unavailability of cheap drugs means fewer resources for other aspects of health care.

*In re Barr Laboratories, Inc.,* 930 F.2d at 75.

The FDA's current and long-standing dosage form classification system appears to be fully in tune with the objectives of the Hatch–Waxman Amendments. If a generic drug manufacturer is able to safely imitate the therapeutic effects of a pioneer drug, whatever release mechanism the manufacturer uses should be irrelevant. Pfizer's suggestion of defining different release mechanisms as distinct dosage forms would have the effect of virtually eliminating generic competition—a result clearly contrary to one of the principal purposes of the 1994 Act. *See In re Barr Laboratories, Inc.,* 930 F.2d at 76; *Mead Johnson Pharm. Group v. Bowen,* 838 F.2d at 1333. Pfizer's request for a revised dosage form classification system is transparently self-serving. It takes no stretch of the imagination to recognize the significant market advantages Pfizer would reap if its own patented osmotic pump release mechanism were its very own dosage form category—potential generic drug competition would be suppressed for years by the added protections of patent law. Neither Congress nor the FDA has countenanced such a result.

Because Pfizer can show no reason why the FDA's denial of Pfizer's Citizen Petition was arbitrary and capricious or that the FDA's interpretation of dosage form is impermissible or unreasonable under the Federal Food, Drug, and Cosmetic Act, Pfizer's APA claim must fail and summary judgment therefore is entered for defendants. An *Order and Judgment consistent with this Opinion was issued on March 31, 1998.

SO ORDERED.